Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 6021 | DATE | 6/28/2000 |
| CASE TITLE | Dennis E. Carlson vs. William A. Brandt, Jr. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
　　☐ FRCP4(m)　☐ General Rule 21　☐ FRCP41(a)(1)　☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We affirm the decision of the bankruptcy court denying Dennis E. Carlson a discharge from debts. The status hearing set for 6/30/00 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUN 29 2000 | |
| | Notified counsel by telephone. | | date docketed | 70 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 6/28/2000 | |
| | | 00 JUN 28 PM 3:47 | date mailed notice | |
| GL | courtroom deputy's initials | | GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS E. CARLSON,  )
  )
    Defendant-Appellant,  )
  )
v.  ) No. 99 C 6021
  )
WILLIAM A. BRANDT, JR., Trustee,  )
  )
    Plaintiff-Appellee.  )

DOCKETED
JUN 2 9 2000

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

Defendant-Appellant Dennis Carlson (the debtor) voluntarily filed a petition for bankruptcy relief under Chapter 11 on April 16, 1996. Two months later, he converted his bankruptcy petition to one for relief under Chapter 7, at which point plaintiff-appellee William Brandt, Jr. was appointed to serve as the Trustee in the case. Brandt filed a three-count adversary complaint against Carlson in the bankruptcy court, arguing that the debtor should be denied a discharge because he: 1) concealed and transferred property in violation of § 727(a)(2) of the Bankruptcy Code; 2) failed to keep books and records sufficient to enable the Trustee to determine his financial condition with reasonable certainty, in violation of § 727(a)(3); and 3) made false oaths in violation of § 727(a)(4). The bankruptcy court held a bench trial, after which it issued findings of fact and conclusions of law in a published opinion which ruled against Carlson on all counts and denied him a discharge. *See In re Carlson,* 231 B.R. 640 (Bankr. N.D. Ill. 1999). Carlson now appeals all of the bankruptcy court's determinations.



## Background

First we briefly address Carlson's jurisdictional challenge. As far as this Court is concerned, trustee Brandt submitted a proper motion to vacate the 12/28/99 judgment in favor of debtor Carlson. We granted that motion and set a briefing schedule on the appeal before us now. Even though Brandt technically brought his motion to vacate under Federal Rule of Civil Procedure 60(b) instead of Federal Rule of Bankruptcy Procedure 8015, the U.S. Trustee's brief in support of Brandt's motion cleared up the confusion and Brandt filed his motion within the ten-day time period proscribed by Rule 8015, so we decided to treat it as such. And this Court is confident that it has the discretion, within a reasonable period of time, to correct or vacate judgments mistakenly made, which is precisely what happened when we granted judgment for Carlson in open court in Brandt's absence. We conclude that jurisdiction over this appeal is proper, and proceed now to the merits.

In a bankruptcy appeal, we examine findings of fact for clear error, accepting the bankruptcy court's version of the facts unless, "'although there is evidence to support [the findings, we are] left with the definite and firm conviction that a mistake has been committed.'" *In the Matter of Sheridan,* 57 F.3d 627, 633 (7th Cir. 1995) (internal citations omitted). To be clearly erroneous, "'a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish.'" *Piraino v. Int'l Orientation Resources, Inc.,* 137 F.3d 987, 990 (7th Cir. 1998) (quoting *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir. 1988)). Furthermore, we give due regard to the trial judge's assessment of

the credibility of the witnesses observed. *Piraino,* 137 F.3d at 990. We review all questions of law de novo. *See Sheridan,* 57 F.3d at 633.

After reviewing the common law record as well as the bankruptcy trial transcripts, we find Judge Schmetterer's factual conclusions to be reasonable in light of the evidence presented, so we will not second-guess them. Those findings are laid out in detail in the bankruptcy court's memorandum opinion and order, *see Carlson,* 231 B.R. 643-51, so we will not recite the facts in their entirety here. We will, however, summarize them for background purposes.

Debtor Carlson is an Illinois attorney who, prior to filing for bankruptcy, primarily represented personal injury plaintiffs on a contingency fee basis. On December 27, 1995, three and a half months before Carlson filed his bankruptcy petition, he and William Hourigan – a friend and colleague of Carlson's who represents Carlson in this appeal – executed what they call a "Practice Merger Agreement" (PMA).[1] The agreement purported to merge the practices of Carlson and Hourigan (after a certain date they were to share an office), apparently so that Hourigan could help Carlson manage his caseload. The PMA did not explain how each attorney's pending cases would be treated or clarify whether all of each attorney's cases would be covered by it. Rather, the PMA stated that "Carlson is an independent licensed attorney and an independent contractor . . . [who] is free to handle cases assigned to him in the manner he sees fit," and "it is agreed that William E. Hourigan will be available to consult and advise, but when, where and how cases which are assigned to Dennis E. Carlson are handled is strictly up to him." Carlson and Hourigan testified at

---

[1] The full text of the PMA can be found in the bankruptcy court's opinion, *In re Carlson,* 231 B.R. 640, 644-45 (Bankr. N.D. Ill. 1999).

trial that the PMA did not create a partnership or professional corporation, and that neither was an employee of the other. When the PMA was signed, not only did Carlson lack sufficient assets to pay his debts, but he knew that he was facing disciplinary action that would likely cause him further financial distress. Hourigan was aware too that Carlson was facing possible disciplinary action as well as large claims for personal sanctions he incurred while litigating, and the PMA itself acknowledged that at the time of signing Carlson's license to practice law was in jeopardy.

Although Carlson and Hourigan eventually testified that they never expected the PMA to cover all of Carlson's cases, the parties did not create any list indicating which of Carlson's pending cases would be included under the PMA until the bankruptcy court ordered Carlson to do so in September 1996. At trial, Hourigan testified that only complex cases were intended to be included, while Carlson testified that only contingency fee cases were intended to be included, and the PMA is silent on the matter. The PMA lacks any contractual language of assignment, yet both Carlson and Hourigan testified at trial that they intended for Carlson's cases and fees to belong to Hourigan as of the PMA's effective date. Though the agreement did not so specify, Carlson testified that he understood it to create a contractual obligation to hand over all of his fees to Hourigan, but that he did not consider it to constitute an "assignment" of his cases or fees. None of Carlson's clients consented in writing to a division or sharing of legal fees between Carlson and Hourigan; indeed it appears that his clients were not even notified of the merger.

The agreement set up a complicated schedule regarding "compensation" for Carlson. We will not provide all of the details here, but notably, under the payment scheme, any fees from cases in progress that were resolved during January or February

1996 would belong only to Carlson "regardless of when the check arrives," and beginning in March, Carlson would be paid $5,000 a month so long as he had generated $8,000 in fees in advance. If Carlson were to generate and collect more than $8,000 in fees for three months in a row and it appeared that he would generate over $100,000 of fees for the year, "then he [would] receive 30% of the excess fees based upon the estimation in the fourth month and each month thereafter, to be adjusted on a monthly basis." Hourigan was to cover all case expenses incurred after the effective date of the PMA, but "any uncollected case related expense incurred by [Carlson] on cases which he had in his office prior to the merger will remain his liability." There was no mention of how cases would be "assigned" to Carlson, leaving open the question whether he would only work on the cases of his own clients.

Several years earlier, in 1991, Carlson filed a personal injury lawsuit in the Circuit Court of Cook County on behalf of his client Carmen Gonzalez, individually and as mother and guardian of Anthony Gonzalez, a minor. Carlson's fee agreement with Gonzalez provided that Carlson would be entitled to receive one-third of any amount recovered on Gonzalez's behalf, plus reimbursement for expenses. In January or February 1996, shortly after the signing of the PMA but before Carlson filed for bankruptcy, the Gonzalez defendant agreed to pay Gonzalez $58,000 to settle the matter. On March 1, 1996, Carlson filed a "Petition to Confirm Settlement of Minor's Claim or Reinstate" in the Law Division of the Circuit Court of Cook County, and on March 27, Carlson appeared before that court and obtained entry of an order approving the settlement. Just the day before, on March 26, the Illinois Supreme Court suspended Carlson's license to practice law for 60 days because of ARDC charges brought against him. So Hourigan stood in and

obtained probate court approval of the minor's settlement since Carlson was not able to do so.

On April 16, 1996, when Carlson filed his Chapter 11 petition, the Gonzalez settlement proceeds had not yet been disbursed. Within a few days of Carlson's bankruptcy filing, Hourigan got the $58,000 check and, after paying the client's share, deposited the remainder in a bank account in his own name. Over the next few months, Hourigan paid Carlson the equivalent of almost all of Carlson's fees and expenses for the Gonzalez case, and followed Carlson's directions to give certain amounts to Carlson's ex-wife Loraine.[2] Hourigan also paid himself $1500 as compensation for the probate work he did, although the reasonable value of that work was only $500 plus $85 that he advanced in expenses. Hourigan ended up giving some of the $1500 back to Carlson, as the total amount that he paid out to Dennis and Loraine (through August 1996, well after the case had been converted to one under Chapter 7 of the bankruptcy code) exceeded the amount originally deposited from the Gonzalez settlement proceeds.

Judge Schmetterer found that Carlson and Hourigan continuously ignored the provisions of the PMA following its execution on December 27, 1995. For example, although the PMA did not expressly exclude any of Carlson's cases, between January 1, 1996 and March 31, 1996, Carlson directly received more than $16,000 in fee payments that he did not pay to Hourigan nor deposit into a joint account. He kept some of that money for his own needs and gave some to his former wife Loraine. In fact, the only fees

---

[2] Carlson testified at trial that these payments to Loraine were for back child support and maintenance, but he did not list any debt to Loraine in his schedule of debts and he did not disclose several pre-petition transfers to her in his statement of financial affairs.

that Carlson and Hourigan treated as included under the PMA were those for Carlson's pre-bankruptcy work on the Gonzalez case that were received one or two days after Carlson filed for bankruptcy. Carlson did not disclose the Gonzalez fees due in his bankruptcy statements and schedules (nor did he include Gonzalez on the list of cases intended to be covered by the PMA that he prepared in response to the bankruptcy court's order); it was only after the Trustee's work uncovered the payments that Carlson asserted the view that the fees and expenses for the Gonzalez case belonged to Hourigan, not to the bankruptcy estate.

## Discussion

We now turn to the bankruptcy court's conclusions of law. Carlson first argues that Judge Schmetterer incorrectly applied Illinois law in determining that Carlson's interest in contingent attorney's fees from the Gonzalez case constitutes an asset of his bankruptcy estate and thus had to be turned over to the trustee. Carlson relies on an Illinois Supreme Court holding that an attorney's potential contingent fees do not constitute part of the marital estate subject to valuation and division between divorcing parties. *In re Marriage of Zells*, 572 N.E.2d 944, 945 (Ill. 1991). The *Zells* court based its conclusion on the nature of contingent fees: whether or not they will be received and if so what the amount will be remains highly speculative during the pendency of the divorce case. *See id.* Therefore, such fees are best treated as part of a divorcing attorney's income and considered in the context of support and maintenance determinations. *See id.* The Court also recognized that ordering division of contingent fees as a marital asset would run afoul of the Illinois

Rule of Professional Conduct 5.4 which prohibits lawyers from sharing fees with non-lawyers except in certain circumstances. *See id.*

This case is distinguishable from *Zells* in a number of ways. First, this is not a divorce case, and we are not dividing marital assets. Second, the fee disputed in this case is not speculative as was the fee in *Zells*. Carlson filed his bankruptcy petition on April 16, 1996. The parties to the Gonzalez case agreed to settle for the exact amount of $58,000 as early as January or February 1996, and Carlson's fee agreement provided that he would be entitled to receive one-third of any amount recovered plus reimbursement for expenses. The Circuit Court of Cook County approved and confirmed the $58,000 settlement amount on March 27, 1996. Although the check for the proceeds had not been disbursed by the time Carlson filed for bankruptcy, all of the work that Carlson did on the case – and even the probate court approval obtained by Hourigan once Carlson's license to practice law was suspended on March 26 – was done pre-petition. A check for $58,000 was delivered to Hourigan just a day or two after Carlson filed for bankruptcy. Because Carlson's interest more closely resembled an "account receivable" than a still-speculative contingency fee, including it in his bankruptcy estate was proper. *See In re Marriage of Tietz*, 605 N.E.2d 670, 679 (Ill. App. Ct. 1992) (finding *Zells* inapplicable to accounts receivable, which are assets already earned with a known value but not yet collected).

Furthermore, the Bankruptcy Code specifies that the estate encompasses "all legal and equitable interests in property held by the debtor at the time of filing," *see* 11 U.S.C. § 541(a), and this includes all "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an

individual debtor *after* the commencement of the case." *Id.* at 541(a)(6) (emphasis added). A number of courts have held that under this definition, contingency fees owed to a debtor-attorney at the time of the bankruptcy filing for legal services performed *before* the petition was filed are a part of the debtor's estate. *See, e.g., Turner v. Avery*, 942 F.2d 772, 774 (5th Cir. 1991) (fees earned pursuant to contingency fee contracts prior to bankruptcy filing fall into estate); *In re Bagen*, 186 B.R. 824, 829 (Bankr. S.D.N.Y. 1995), *aff'd*, 201 B.R. 642, 643-44 (S.D.N.Y. 1996) ("Under the new Bankruptcy Code, Congress intended property of the estate to include . . . [the attorney-] debtor's contingent contract right to future payments"). While the Seventh Circuit has not reached this question directly, it has repeatedly found § 541 of the Bankruptcy Code to define "property of the estate" broadly and has observed that "'an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.' . . . In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *In the Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) (internal citations omitted). *See also Carlson v. Brandt*, No. 97 C 2165, 1997 WL 534500, at *7 (N.D. Ill. Aug. 22, 1997) (Grady, J.) (citing *In the Matter of Carousel Int'l Corp.*, 89 F.3d 359, 362 (7th Cir. 1996), among others).[3] Even though the money was collected a day or two after

---

[3] Carlson's assertion that allowing the trustee to include the Gonzalez fees in the bankruptcy estate would require Carlson to engage in illegal fee-splitting with a non-attorney is misguided. Carlson is not being asked to share his fees with trustee Brandt in his individual capacity; even though Brandt does stand to receive a small percentage of the total estate assets as compensation for his services, the trustee has the official job of identifying and valuing the assets of the debtor's estate in order to satisfy creditors' claims, and it is in this capacity that Brandt seeks access to the fees. Were we to credit Carlson's argument, all attorneys who file for bankruptcy would be able to exclude from their bankruptcy estates any fees owed for pre-petition work they did, which could not have been the intent of the Bankruptcy Code given the language of 11 U.S.C. § 541(a)(6).

Carlson filed his petition, the estate includes the entire Gonzalez fee less the reasonable value of Hourigan's efforts to obtain probate court authorization of the deal. *See In re Jess,* 169 F.3d 1204, 1207 (9th Cir. 1999) ("[debtor-attorney's] estate is entitled to recover the portion of post-petition payments attributable to pre-petition services"); *see also Watts v. Williams,* 154 B.R. 56, 58 (S.D. Tex. 1993) (value of debtor-attorney's pre-petition services on contingent fee contracts is bankruptcy estate property); *In re Nelson,* 203 B.R. 756, 761 (Bankr. M.D. Fla. 1996) (value of contingent fee agreement to bankruptcy estate can be determined on quantum meruit basis).[4]

Carlson maintains that the Gonzalez fees and reimbursed expenses were not part of the bankruptcy estate because he was bound to turn them over to Hourigan pursuant to the Practice Merger Agreement, but we conclude, as did the bankruptcy court, that the PMA is unenforceable. Without even reaching the question whether the PMA gave Carlson ample consideration in exchange for Carlson's assignment to Hourigan of his rights to legal fees in certain cases (one of Judge Schmetterer's grounds for rejecting it), we find the agreement void because it violates Rule 1.5 of the Illinois Rules of Professional Conduct (IRPC). Under Rule 1.5(f):

> a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses: (1) that a division of fees will be made; (2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the

---

[4] Contrary to Carlson's contention, Illinois law does not limit quantum meruit awards to cases where an attorney hired by a contingent fee contract is *discharged* by his or her client; rather, such valuation of legal services rendered can be made even in cases of attorney withdrawal, so long as the withdrawal is for good cause. *See Kannewurf v. Johns,* 632 N.E.2d 711, 715-16 (Ill. App. Ct. 1994).

division; and (3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.

Rule 1.5 reflects the state's concern that clients be guaranteed the right to representation of their own choosing, "the most recent expression of the long-standing policy of this state" prioritizing clients' rights over lawyers' remedies. See *Albert Brooks Friedman, Ltd. v. Malevitis*, 710 N.E.2d 843, 847 (Ill. App. Ct. 1999). Carlson presented no evidence that any of his clients executed written consent to his sharing of fees with Hourigan. With respect to the Gonzalez case specifically, the first case to which Carlson and Hourigan applied the PMA, Carlson admitted at trial that Mrs. Gonzalez did not sign anything consenting to the fee-splitting, and Hourigan admitted the same in his testimony. Carlson claims that Mrs. Gonzalez consented orally "on the record" at a state probate court hearing attended by both Hourigan and Carlson, but he did not produce any transcript or other evidence of such oral consent, and only a written consent document would prove that the disclosures required by Rule 1.5(f) were made to the client. Contracts between lawyers that constitute fee-splitting in violation of Rule 1.5(f) are illegal, see *Albert Brooks Friedman*, 710 N.E.2d at 846-47 (Illinois Supreme Court rules have the force of law and are indicative of public policy in the area of attorney conduct), and illegal contracts are void and unenforceable under Illinois law. See *U.S. Nursing Corp. v. Saint Joseph Med. Ctr.*, 39 F.3d 790, 792 (7th Cir. 1994).

Carlson and Hourigan contend that the PMA does not violate Rule 1.5(f) of the IRPC because the rule only prohibits fee-splitting among lawyers who are not in the same law firm, while the effect of the PMA was to create one firm of which both Carlson and Hourigan were a part. But we are not persuaded by this argument, because the terms of

the PMA do not support it. First, as we observed earlier, both Carlson and Hourigan testified that they did not understand the agreement to create a partnership or professional corporation, and they did not intend for Carlson to be Hourigan's "employee."[5] The agreement specifically considered Carlson to be "an independent contractor," emphasizing that "he is free to handle cases assigned to him in the manner he sees fit," and that although Hourigan would "be available to consult and advise," it would be entirely up to Carlson to decide when, where and how his cases would be handled. While Hourigan testified that the payment to Carlson provided for by the PMA was intended to be in the nature of wages or salary, the language of the agreement suggests otherwise. Instead of giving Carlson a set salary to compensate him for hours worked or services performed for Hourigan's "firm," the agreement entitles Carlson to a percentage of the fees brought in by his own cases ($5000 a month provided that he generates $8000 in fees in advance, and 30% of any excess fees if over $8000 is collected for three months in a row and if it appears that Carlson will generate over $100,000 in fees that year), and the remaining fees go to Hourigan. This constitutes "fee-splitting," whether or not the parties call it "payment" or "compensation." The policy concern underlying Rule 1.5(f) — the protection of clients' rights to the representation of their choosing — is directly implicated by the PMA's arrangement that "[i]n the event of termination [by either party], it is agreed that the cases transferred by Dennis E. Carlson shall remain with William E. Hourigan," since no informed consent to that effect was executed.

---

[5] Hourigan testified more specifically that he would not feel responsible if Carlson were to practice law negligently (although he thought the law would hold him responsible anyway), and that he did not withhold any taxes or take any other deductions when he paid Carlson. Tr. at 28-29.

We turn now to the counts brought against Carlson by the trustee. The bankruptcy court denied Carlson a discharge based on its finding that Carlson violated §727(a)(2) of the Bankruptcy Code, under which a discharge should be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). The court's findings support the conclusion that Carlson transferred or concealed property of the bankruptcy estate both within one year before the filing of his petition and after the petition was filed. The Seventh Circuit has explained that "[a] concealment . . . need not be literally concealed. The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment." *In the Matter of Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981). Here, the bankruptcy court found that Carlson concealed the Gonzalez fees – which, as we explained above, are part of the bankruptcy estate – by causing and permitting the fees to be transferred to Hourigan (under the guise of the PMA) while ultimately receiving a total of $19,100 of those fees, some directly from Hourigan and some indirectly through payments to Loraine.[6] Not only did Carlson fail to disclose these fees on his bankruptcy schedules, but he did not name the Gonzalez case on the list of cases covered under the PMA that the bankruptcy court ordered him to file during the pendency of his proceedings, even though he later testified at his Rule 2004 examination that he had

---

[6] Carlson received $4,295 of the fees after converting his case under Chapter 7.

disclosed all of the cases called for by the court's order. Carlson also received two checks for pre-bankruptcy work from his clients Jerry and Shirley Meyer in August and September 1996 that he did not disclose on his bankruptcy schedules nor turn over to the trustee. Rather, he did what he had done with several checks that he got from clients between the signing of the PMA and his bankruptcy filing (while failing to disclose those payments in his statement of financial affairs and falsely stating that he had no income from January 1, 1996 through the date of his filing in April 1996): he endorsed the checks over to Loraine and instructed her to return some of the money to him in cash and to keep the rest (although, as we observed earlier, he did not mention any child support or maintenance debts in his bankruptcy filings). Given the evidence presented, the bankruptcy judge's conclusion that Carlson transferred and concealed assets was far from clearly erroneous.

The final prong of the § 727(a)(2) inquiry – the question whether Carlson had the requisite intent to hinder, delay, or defraud the trustee during the course of this conduct – is one of fact. See Yonikus, 996 F.2d at 872-73. A finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct, since a debtor is not likely to testify that his or her intent was fraudulent. See In the Matter of Krehl, 86 F.3d 737, 743 (7th Cir. 1996). Indeed, "[t]he intent determination often will depend upon a bankruptcy court's assessment of the debtor's credibility, making deference to the court's finding particularly appropriate." Id. at 743-44; Fed. R. Bankr. P. 8013. We will not second-guess the bankruptcy judge's choice between the rational conclusions that could be drawn from the evidence before him, let alone find it to have been "clearly erroneous." Krehl, 86 F.3d at 744. Judge Schmetterer found the cumulative pattern of

Carlson's wrongful conduct and omissions to be indicative of his bad faith intent "to hide the fact that most of such funds were funneled through Hourigan for return to Carlson to use for his needs and purposes in a way unlikely to be traced." *Carlson*, 231 B.R. at 654. Carlson claims in his appeal briefs – as he did on the stand at the trial – that he was confused and distressed about filing for bankruptcy and thus merely made mistakes, but Judge Schmetterer found his testimony not to be credible or convincing, and Carlson's "protest of innocent misunderstanding is insufficient to overturn such clear factual analysis by the bankruptcy court." *Yonikus*, 996 F.2d at 873.

The court also found the denial of Carlson's discharge to be warranted under paragraphs (a)(3) and (a)(4) of 11 U.S.C. §727. Under §727(a)(3), a discharge may be denied if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Section 727(a)(4) calls for the denial of a discharge to the debtor who "knowingly and fraudulently, in or in connection with the case made a false oath or account," which may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination during the course of the bankruptcy proceedings. *See, e.g., Yonikus*, 996 F.2d at 871. Our review of both the bankruptcy court's findings and the relevant law satisfies us that the evidence supports the court's conclusions that Carlson violated §§ 727(a)(3) and (a)(4), but we need not reach these questions definitively nor address the violations in detail because we have already found the denial of a discharge

appropriate due to Carlson's violation of § 727(a)(2), and the other provisions of § 727(a) are merely alternative grounds for denying a discharge. See *Krehl*, 86 F.3d at 744 (quoting *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 250 (4th Cir. 1994) ("'A party objecting to discharge need prove only one of the grounds for non-dischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive. Proof of conduct satisfying any one of the sub-sections is enough to justify a denial of a debtor's request for a discharge'").

### Conclusion

For the foregoing reasons, we affirm the decision of the bankruptcy court denying Dennis E. Carlson a discharge from debts.[7] It is so ordered.

/s/ Marvin E. Aspen
MARVIN E. ASPEN
United States District Judge

Dated: 6/28/00

---

[7] We find reprehensible Carlson's argument that "he is being hung out to dry" and denied a discharge simply because he is an attorney who was *pro se* and made errors before the bankruptcy court. Equally offensive is his suggestion that he was denied due process and fundamental fairness because Judge Schmetterer – who was absent from the bench for a long period post-trial due to his wife's unfortunate illness – issued the opinion eleven months after the trial "with only his notes to rely on" and thus must have forgotten his earlier rulings regarding the precise nature and scope of the claims.